UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

```
                                    )
DEREK BIGGS,                        )
     Petitioner,                    )
                                    )
     v.                             )  CIVIL ACTION NO.
                                    )  2005-10503-JLT
KATHLEEN M. DENNEHY, COMMISSIONER   )
FOR THE MASSACHUSETTS DEPARTMENT    )
OF CORRECTION FOR THECOMMONWEALTH   )
OF MASSACHUSETTS,                   )
     Respondent,                    )
                                    )
```

PETITIONER, DEREK BIGGS' MEMORANDUM OF LAW IN
OPPOSITION TO RESPONDENT'S MOTION TO DISMISS AND
IN SUPPORT OF PETITIONER'S REQUEST FOR A STAY OF
THE HABEAS CORPUS PROCEEDINGS AND PETITIONER'S
REQUEST FOR APPOINTMENT OF COUNSEL FOR THE
PURPOSE OF REPRESENTATION IN HABEAS CORPUS PROCEEDINGS

ISSUES PRESENTED

1.    Whether this Honorable Court should deny
the Respondent's Motion to Dismiss and stay the Habeas
Corpus Proceedings for the purpose of allowing Petitioner
to return to state court to exhaust state remedies
on certain grounds of the Petition, where the failure
to allow the stay would effectively time bar the Petitioner
from all habeas corpus proceedings.

2.    Whether this Honorable Court should appoint
counsel to represent the Petitioner in this case, pursuant to
18 U.S.C. § 3006A(a)(2)(B) in the interest of justice.

-1-

## STATEMENT OF PRIOR PROCEEDINGS

On December 19, 1997, a Suffolk County Grand
Jury returned seven indictments against the Petitioner,
Derek Biggs(hereinafter "Petitioner"), which charged
the Petitioner with: one count of Kidnapping in violation
of M.G.L. c.265, § 26 on Suffolk County Indictment
numbered 97-12179-001; three counts of Rape in violation
of M.G.L. c. 265, § 22(b) on Suffolk County Indictment
numbers 97-12179-002, 97-12179-003, and, 97-12179-
004; and, three counts of Aggravated Rape in violation
og M.G.L. c. 265, § 22(a) on Suffolk County Indictment
numbers 97-12179-005, 97-12179-006. and 97-12179-007
(P. Aff., p. 2, ¶ 5).[1]/

Trial commenced on May 13, 1999, against the
Petitioner on the above-indictments by jury trial,

_____

[1]/ All references to the Affidavit of the Petitioner,
      Derek Biggs In Support of His Request for a Stay
      of the Habeas Corpus Proceedings and Request
      for the Appointment of Counsel will be refered
      to as "P.Aff., p. __, ¶ __", with respective
      page and paragraph number assigned.  All references
      to Exhibits attached to the Petitioner's Affidavit
      will be cited as "P.Exh. ___", with respective
      exhibit number assigned.  All references to the
      Petitioner's Petition will be cited as "P., p.
      ___, ¶ ___", with respective page number assigned.

Judge Christine McEvoy, presiding and after a wekk long jury trial on May 20, 1999, the jury found the Petitioner guilty of Kidnapping (M.G.L. c. 265, § 26) on Suffolk County indictment numer 97-12179-001 and on two counts of Aggravated Rape (M.G.L. c. 265, § 22[a]), based upon natural and unatural intercourse respectively on Suffolk County Indictment numbers 97-12179-006 and 97-12179-007. The jury acquitted the Petitioner of the third count of Aggravated Rape (M.G.L. c. 265, § 22[a]), based upon natural sexual intercourse on Suffolk County indictment number 97-12179-005. Also, the three counts of Rape (M.G.L. c. 265, § 22[b]) on Suffolk County indictment numbers 97-12179-002, 97-12179-003 and 97-12179-004 were dismissed on motion by the Commonwealth (P.Aff., p. 3, ¶ 6).

On May 24, 1999, Judge McEvoy sentenced the Petitioner to fifteen to twenty years at the Massachusetts Correctional Institution at Cedar-Junction for one count of Aggravated Rape (M.G.L. c. 265, § 22[a]) on Suffolk County indictment numbers 97-12179-007 and to ten years probation, to be served consecutively, after the previous sentence for the second Aggravated Rape (M.G.L. c. 265, § 22[a])

-3-

conviction on Suffolk County indictment numbered
97-12179-006.  The Kidnapping conviction (M.G.L. c.
265, § 26) on Suffolk County indictment numbered 97-
12179-001 was vacated by the Trial Judge, based upon
merger grounds under the holding in Commonwealth v.
Berry. 420 Mass. 95 (1995)(P.Aff., pp. 3-4, ¶ 7).
Also, on May 24, 1999, the Petitioner, through counsel,
filed a timely Notice of Appeal, pursuant to Rule
3, Mass.R.App.P., the case was docketed in the Massachusetts
Appeals Court on December 8, 2000.  Thereafter, Appellate
Counsel, Maxine Sushelsky, stayed the Petitioner's
first direct appeal and thereafter filed a motion
for a new trial, pursuant to Rule 30(b), Mass.R.Crim.P.,
a motion to correct the record, pursuant to Rule 8(e),
Mass.R.Appp.P. to include matters not made part of
the trial record, an Affidavit of Appellate Counsel
in Support and a memorandum of law in support of the
motion for a new trial on April 17, 2001 (P.Aff.,
p. 4, ¶ 8).

On July 11, 2001, the Commonwealth filed an
Opposition to the Petitioner's motion for a new trial

and thereafter on July 20, 2001, Petitioner's Appellate
Counsel filed a reply to the Commonwealth's Opposition
to the Petitioner's motion for a new trial (P.Aff.,
4, ¶ 9).

On January 11, 2002, the Petitioner represented
by Appellate Counsel attended a non-evidentiary hearing
for the purpose of arguing the Petitioner's motion
for a new trial, Judge McEvoy presiding. After the
new trial non-evidentiary hearing had been held, the
Petitioner, on the advice of Appellate Counsel withdrew
certian issues from the Petitioner's motion for a
new trial on January 30, 2002 (P.Aff., p. 5, ¶ 10).

On February 8, 2002, the Trial Judge, denied
the Petitioner's request to expand the record and
allowed the motion to withdraw certain issues from
the Petitioner's motion for a new trial (P.Aff., p.
5, ¶ 11).

On March 5, 2002, Petitioner's Appellate Counsel
filed a timely notice of appeal, pursuant to Rule
3, Mass.R.App.P. on the court's denial of the motion
for a new trial, the record was thereafter transmitted

-5-

to the Massachusetts Appeals Court on March 12, 2002
and the case was entered in that court on March 13,
2002.   Thereafter, the Petitioner's first direct appeal
and the denial of the Petitioner's motion for a new
trial were consolidated in the Massachusetts Appeals
Court (P.Aff., p. 5, ¶ 12).

On October 20, 2003, the judgments of the Petitionr's
convictions were affirmed, as well as the denial of
the Petitioner's motion for a new trial were affirmed
by the Massachusetts Appeals Court in an unpublished
decision, pursuant to Rule 1:28 of the Massachusetts
Appeals Court Rules.  See, Commonwealth v. Derek Biggs,
59 Mass. App. Ct. 1107, 2003 Mass.App. LEXIS 1116(October
20, 2003)(P.Aff., pp. 5-6, ¶ 13).

Appellate Counsel thereafter filed an Application
for Further Appellate Review in the Supreme Judicial
Court for the Commonwealth of Massachusetts, which
application was denied on December 23, 2003.  See,
Commonwealth v. Derek Biggs, 440 Mass. 1103, 2003
Mass. LEXIS 931 (December 23, 2003)(P.Aff., p. 6,
¶ 14).

The Petitioner's Appellate Counsel thereafter requested the Committee for Public Counsel Services to represent Petitioner for further review, including, but not limited to representation of Petitioner in habeas corpus proceedings, but that the Committee for Public Counsel Services denied that request (P.Aff., p. 6, ¶ 15). Since that time, Petitioner has been actively seeking assistance from numerous attorneys for the purpose of representing Petitioner in any post-conviction proceedings, including, but not limited to representing Petitioner on w writ of habeas corpus in federal court, as well as within the Massachusetts Court system (P.Aff., pp. 6-7. ¶ 16; P.Exh. 1 and 2).

That Petitioner, after not being able to secure legal representation, spoke with another inmate, who is a paralegal, who thereafter reviewed Petitioner's transcripts and documents of Petitioner's case, had performed legal research to isolate legal issues, which were considered meritorious and put together the Petitioner's Writ of Habeas Corpus for him (P.Aff., p. 7, ¶ 17; See Also: Document number 1 on the Court's Docket, Supplemental Pages 6 through 12, Grounds 12[I]: Ground Nine through Ground 12[N]: Ground Fourteen).

-7-

## STATEMENT OF THE FACTS

### 1.   General Outline/Summary Of The Case:

This case involved a November 16, 1997 enoounter:
between the Petitioner, Derek Biggs(hereinafter "Biggs")
and the Complainant.  The controversey to be resolved
by the jury was whether the two had engaged in consensual
sexual acts or whether Mr. Biggs kidnapped the Complainant
and raped her three times.  The long and the short
of the case turned on the jury's measure of the credibility
of Biggs or the Comlainant   (Tr. I/6-7). $\frac{2}{}$

### 2.   The Jury Impanelment:

> a.   Mandatory Jury Questions, Pursuant
> To M.G.L. c. 234, § 28 Regarding
> Presumption Of Innocence And Proof
> Beyond A Reasonable Doubt:

The Trial Judge in this case asked the mandatory
questions, pursuant to M.G.L. c. 234, § 28 regarding
the Presumption of Innocence and Proof Beyond a Resonable
Doubt, as follows:

---

$\frac{2}{}$   All references to the Trial Transcripts will
be cited as "Tr. __/__", with respective Volume
amd page number assigned/desiganted.

-8-

THE COURT:    Jurors, I am going to instruct you
on a principle of law that is not only the law in
this Commonwealth but in this entire country.  And
it is the law and you must apply it to this case.
The principle is this, that in a criminal case, the
defendant, this defendant, any defendant, is presumed
to be innocent until and unless he is proven guilty.
That is the law.   It must be appliedto this case.
If for any reason you don't understand it or can't
apply it to this case, please indicate by raising
your hand.   The principle is the defendant is presumed
innocent until and unless proven guilty.  Please indicate
by raising your hand if you don't understand it or
can't apply it to this case.

COURT OFFICER: Panel 5, seat 15.

THE COURT:    Jurors, closely related to that
principle of law is this one, and that is this, that
the Commonwealth, through the assistant district attorney,
the prosecutor, has the burden of proving guilt beyond
a reasonable doubt; and the defendant has no obligation
to present any evidence on his behalf.  So the principle
of law is that the burden of proof is upon the government.
It is beyond a reasonable doubt, and the defendant
has no obligation to present any evidence on his behalf.
Again, that is the law that you must apply to this
case.   If for any reason you cannot, please indicate
by raising yuour hand.

COURT OFFICER: Panel 5, seat 15; Panel 7, Seat
8.

(Tr.  I/15-17).

No other further explanation regarding the presemption

of innocence or proof beyond a reasonable doubt were

given by the Trial Judge prior to the jury being impaneled

in this case    (Tr.  I/3-129).

-9-

b.   The Prosecution's Premptory Challenges:

During the jury selection in this case, the Commonwealth, through the prosecutor challenged each african-american juror on the panel, the first being Juror number Panel 8, Seat 13, which was Stephanie Norris (Tr. I/98-99), the second juror was Juror number Panel 9, Seat 1, which was Diane Ellis   (Tr. I/101-102).   However, after the second african-american juror had been challenged the following colloquy took place:

MR. BELEZOS: May I be heard.

THE COURT: You may.  Hold the juror outside the courtroom please.

(side-bar conference).

MR BELEZOS: Your Honor, I normally wouldn't challenge a peremptory, but this is two straight black woman who have been excluded from the jury, and I wondered if there was any particular reason.

THE COURT:   What was the reason for the last challenge?

MS. KNIGHT:   Judge, it actually has to do with some behavior that I observed outside the courtroom with this witness.

THE COURT:   Not witness.

MS. KNIGHT:   I'm sorry.   The juror, and just her behavior at that point in time.

THE COURT:   Well, what was the behavior?

-10-

MS. KNIGHT:  She was rather ruse and inappropriate
about coming into the courtroom and was delaying.
And I just observed something and I decided at that
time that if she was to be a potential juror that
she would be somebody that I would strike.

THE COURT:  I accpt it.  But, if there is another
challenge to a black, I am going to ask you to state
why.

MS. KNIGHT:  And, Judge, while we are at side-
bare, I only suggest that defense counsel has challenged
every single white female that has been presented
before the Court.

MR. BELEZOS:  Actually, your Honor, there are
two females that I have not challenged.

MS. KNIGHT:  There is actually one, Ms. Noriega.

MR. BELEZOS:  I believe there are two females,
but I could be wrong.

THE COURT:  Well, I am not going to find a pattern
at this point.

(Tr. I/102-104).

(End side-bar conference.)

However, at the time of the Commonwealth's allegations

that Attorney Belezos had challenged every white female

presented to the court, which the prosecutor knew

was baseless and false, there were four white female jurors

already seated on the jury, who were: Juror number 2, Jaime

Weinberg  (Tr. I/32-34), Juror number 3, Beth Zailyn

Noriega  (Tr. I/50-52), Juror number 4, Jennifer Couperus,

-11-

(Tr. I/69-71), and, Juror number 5, Margaret Rizzo
(Tr. I/75-78).

The third challenge by the Commonwealth, through
the prosecutor of the third african-american juror,
a male was Lawrence Hunter  (Tr. I/117-118).  After
this challenge to the third african-american juror
in the jury panel, who was declared eligible and not
excused by the Trial Judge, Attorney Belezos requested
another side-bar conference  (Tr. I/118), which went
as follows:

MR. BELEZOS: Side bar, your Honor?

THE COURT:            Side bar.  Hold the juror
please.

(Side-bar conference.)

THE COURT:  Counsel?

MR. BELEZOS:  The Court indicated if there was
another minority struck that there would be an explanation
in order.

THE COURT:  Yes.

MS. KNIGHT:  Judge, the Commonwealth's challenge
was based on his hesitation and his answer regarding
interracial relationships in that he did not think
that -- or he actually did not agree with them.  And
I am not certain in this case how it will cut.

THE COURT:    It seems to me that the Court has
to consider the answers of a juror.  I was satisfied
that there was an answer that did not affect his
impartiality.  My understanding is that the question
of interracial relationships would not be raised by
the Commonwealth.  It would be raised by the defendant.

MS. KNIGHT:    Absolutely, your Honor.

THE COURT:  So, that if he disapproves of the
defendant's defense in the case, which is consent,
as I understand it, it seems to me that that is not
going to hurt the government because the government's
theory is that they didn't know each other; correct?

MS. KNIGHT:    Actually, Judge, my concern was
I'm not certain exactly what his position is on that
is.  So I'm not certain how he wuld feel once the
defendant puts that issue into play about interracial
relationships.  I don't know that it was quite clear.

THE COURT:  I don't find that to be a valid reason.
Do you have any other reason?

MS. KNIGHT:    Other than, Judge -- and I have
to be -- but I don't know.  The earring and just his
appearance had something to do with the Commonwealth's
challenge.

THE COURT:    I am going to disallow the challenge.
Seat the juror.

(Tr. I/118-120).

(End side-bar conference.)

THE CLERK:    Mr. Hunter, you'll be Juror No.
12  (Tr. I/120).

-13-

The composition of the jury of twelve jurors,
plus two alternates consisted of: One african-american
male, Lawrence Hunter, Panel 9, Seat 13, Juror Number
12   (Tr. I/117-120); Seven White Females, Jaime Weinbeerg,
Panel 5, Seat 9, Juror Number 2   (Tr. I/32-34), Beth
Zailyn Noriega, Panel 6, Seat 8, Juror Number 3
(Tr. I/50-52), Jennifer Couperus, Panel 7, Seat 6,
Juror Number 4 (Tr. I/69-71), Margaret Rizzo, Panel
7, Seat 10, Juror Number 5   (Tr. I/75-78), Geri Wilson,
Panel 9, Seat 3, Juror Number 8   (Tr. I/104-105),
Carolyn Pechfelder, Panel 9, Seat 8, Juror Number
10   (TR. I/110-111), Angela Maurici, Panel 9, Seat
9, Juror Number 11  (Tr. I/111-112); and Six White
Males, Jerry Lin, Panel 5, Seat 2, Juror Number 1
(Tr. I/25-26), Brian Calabrese, Panel 8, Seat 9, Juror
Number 6  (Tr. I/96-97), Morton Zisk, Panel 8, Seat
11, Juror Number 7   (Tr. I/95-97),  Jonathan Richt,
Panel 9, Seat 6, Juror Number 9   (Tr. I/106-107),
Jame Atkinson, Panel 10, Seat 3, Juror Number 13
(Tr. I/126-128), and David Boulter, Panel 10, Seat
4, Juror Number 14  (Tr. I/128-129).

However, notwithstanding the fact that the Trial
Court made a finding of impermissible race based peremptory

-14-

challenges against african-american jurors from the jury by the Commonwealth, Trial Counsel never moved to have the two other stricken african-american jurors seated on the jury and/or to reconsider the previous ruling of the court (Tr. I/10-133).

3.    The Trial:

The Complainant testified that on November 16, 1997, she had left her boyfriend's Allston apartment at about 5:30 A.M. (Tr. II/102). It had snowed the previous night, was cold, and it was getting light out (Tr. II/102). The Complainant had plans to drive to Maine with friends living on Glenville Avenue, and they had given her keys to let herself into their apartment early in the morning (Tr. II/101-102).

As the Complainant was putting the key into the lock, someone came up behind her, put his hands over her mouth, and tried to get into the apartment with her (Tr. II/106). Unable to unlock the door, the assailant, whom the Complainant subsequently identified as the Petitioner, Derek Biggs, grabbed the keys and dragged the Complainant down the stairs (Tr. II/108, 114). Before leaving, the Complainant reached over and pressed her friend's apartment buzzer (Tr. II/106-

-15-

108).

Biggs kept his hand over the Complainant's mouth and covered her head so she could not see where she was going (Tr. II/108). Neveretheless, she was able to see the ground, and observed that they were walking down Parkvale Avenue (Tr. II/108). The Complainant could not explain how Biggs held the cloth to her face (Tr. II/154). Although her left arm was free, she did not attempt to grab the cloth or remove Biggs' hand from her person (Tr. II/154). Biggs then dragged her upstairs into an apartment on Parkvale Avenue (Tr. II/110).

Biggs sat the Complainant down on a futon on the fllor (Tr. II/111). He was talking about how his mother had recently died and he had identified her body; he indicated he just wanted to talk and that everything was going to be okay (Tr. II/112). The Complainant stated that Biggs sounded drunk (Tr. II/112). Biggs then took Complainant's pants and underwear off, or pushed them down, and raped her vaginally (Tr. II/114-116). The Complainant was inconsistent as to whether Biggs forcefully held the

-16-

cloth to her face in the apartment, or whether it
was tied loosely and fell off  (Tr. II/162-164).

The Complainant then followed Biggs into the
living room and asked if she could leave  (Tr. II/119-
120).  Biggs said he was going to let her go, and
handed her a diet coke (Tr. II/120).  He showed her
some karate papers, saying that a friend had recently
introduced him to karate   (Tr. II/123).  He then
gave the Complainant a silver bracelet, saying that
it had belonged to his mother   (Tr. II/125).

Biggs then unlocked the door to the apartment
(Tr. II/127).  The Complainant asked for her keys
(Tr. II/127).   Biggs then re-locked the door, pushed
her over to the bed, pushed her pants and underwear
down, and put his tongue on her vagina  (Tr. II/128-
129).  The Complainant repeatedly kicked Biggs with
one of her hiking boots, asking him to stop (Tr. II/
128-129). $\underline{3/}$  Biggs then put his penis in her vagina
(Tr. II/131). $\underline{4/}$  Afterwards, the Complainant put her

---

$\underline{3/}$   The police observed no scratches, bruises or
     blood on Biggs  (Tr. II/247).

$\underline{4/}$   Although the Complainant testified to two rapes,
     the jury only convicted Biggs on two.  Due to
     this the Trial Judge's recitation of three rapes
     in the summary of fact on the denial of Bigs
     Motion for a New Trial are clearly erroneous.

-17-

clothes back on; Biggs talked to her for a short while
and returned her keys (Tr. II/131). Biggs also asked
the Complainant if she wanted him to turn himself
in (Tr. II/131-132). The Complainant stated that
she had been at the apartment for about an hour and
a half (Tr. II/131).

The Complainant therafter left Biggs' apartment
and walked to her friends' Glenville Avenue apartment
(Tr. II/135-136). Arriving, the Complainant asked
her friend, Adetokunbo Ajadi, nicknamed "Toks", to
call the police (Tr. II/136). The police "arrived
really quickly." (Tr. II/137). The Complainant talked
with Officer Margaret DiBudeo "and told her what happened".
(TR. II/138).

Writing in her report the morning of the incident,
DiBudeo indicated that the Complainant described only
two incidents of rape, both by natural sexual intercourse
as set forth in the November 18, 1997 police report
of Police Officer Margaret DiBudeo. At trial, however,
DiBudeo testified that immediately after the incident,
the Complainant recounted to DiBudeo the details of
the encounter, which included a total of three incidents

-18-

of rape, two by natural sexual intercourse and one

by oral sex  (Tr. II/71-72, 75-76).$\frac{5/}{}$

     Police Officers went to 50 Parkvale Avenue, Apartment

25, where they knocked on the door and identified

themselves  (Tr. II/238, 240). Biggs opened the door

and after being informed that the police were looking

for an assailant, Biggs agreed to accompany them so

the victim could look at him  (Tr. II/240-242).

Biggs appeared groggy and smelled of alcohol, but

did not seem nervous   (Tr. II/242, 249). The police,

accompanied by Biggs drove to Glenville Avenue, where

the Complaint identified Biggs  (Tr. II/139-140).

The Complainant also denied having met Biggs prior

to the incident  (Tr. II/143).$\frac{6/}{}$

     The police took the Complainant to the hospital

---

5/   However, at trial, Trial Counsel failed to impeach
     Police Officer DiBrudeo or the Complainant utilizing
     the inconsistent police report  (P., 6 & Supplemental
     p. 3, Ground Three, ¶ 12(C).

6/   However, Trial Counsel never asked the Complainant
     how Biggs knew certain intimate details about
     the Complainant, if in point of fact, Biggs testified
     that he had met the Complainant previously and
     knew certain intimate facts about her, something
     of which the jury could have concluded that the
     Complainant's testimony was impeached  (Tr. IV/
     10, 12-13, 17-19; P., Supplemental pp. eight
     and nine, Ground 12(L): Ground Twelve).

where she spoke with doctors and Detective Kennedy
(Tr. II/140, 253-254).   The Complainant was examined
and several specimens were taken from her person and
clothing and submitted to the crime lab  (Tr. II/273,
277, 291-294; Tr. III/80-82).

     Toks had gone to the party with the Complainant
and others the night before; the Complainant had been
drinking but did not sappear to be drunk, and there
had also been some marijuana-smoking (Tr. II/187,
217). At about 5:15 A.M., Toks' doorbell buzzed
(Tr. II/189).  Toks looked out the window, which afforded
a view of the front stoop, but observed no one  (Tr.
II/190-191).  Toks dressed and, when no one respondeded
to him through the intercom, he walked downstairs
to the front door  (Tr. II/191-183).

     Thirty to forty feet away, Toks observed two
people from behind unevenly walking away from his
building  (Tr. II/194-196).  The sun was coming up
and the streetlights were lit  (Tr. II/197).   Toks
was able to get about ten to fifteen feet away from
the copuple  (Tr. II/196-197).  The taller person

-20-

had his arm around the short person, who appeared
to be a woman; their walk appeared to be labored
(Tr. II/196-199). After watching them for a few minutes,
Toks screamed at them, asking why they had rung his
doorbell (Tr. II/201-202). Despite the couple being
close enough to hear Toks, Toks received no distress
signal, and he did not see a cloth on the woman's
head (Tr. II/196, 202, 230, 232).

Boston Police Detective, Joseph Kennedy interviewed
Biggs at the police station after Biggs' arrest (Tr.
II/255). Biggs signed a sheet acknowledging his rights
and agreed to speak with Detective Kennedy (Tr.
II/256-262). Biggs denied having any contact with
the Complainant the night before (Tr. II/262).
According to Kennedy, Biggs indicated that he had
gone to the Day's Inn with his friends, Julie and
Danielle, where he consumed three rum and cokes and
nine beers (Tr. II/262-263). Biggs returned home
with Danielle at about 2:00 A.M.  He subsequently
went out to obtain some food and when Biggs returned
home, Danielle was gone (Tr. II/263-264). After
eating, Biggs went to sleep and was awakened by the

-21-

police at about 8:30 A.M.  (Tr. II/264).

Biggs told Kennedy that his mother had recently died and that he was very depressed about it  (Tr. II/264).  Biggs appeared tired and hung over, but calm  (Tr. II/265-266) and was surprised at the charges being brought against him  (Tr. II/266).

Danielle Patuto testified that in November, 1997, Biggs, whom she had known for two years, was her boyfriend (Tr. III/31-32).  On November 15, 1997, at approximately 11:30 P.M., she went to the Days Inn, a Brighton club, with Biggs and Julie  (Tr. III/34).  Patuto and Biggs shared about two rum and cokes and five beers  (Tr. III/34, 39).

At about 2:30 A.M., Julie drove Biggs and Patuto to 50 Glenvalle, where Biggs lived (Tr. III/32, 34-35).  They each drank a beer and had a sip of scotch (Tr. III/39).  Twice, Biggs left the apartment; both times Patuto went outside to look for him (Tr. III/36, 38).  The first time, Biggs emerged from across the street, where he said his cousin lived (Tr. III/36-37).  The second time, Patuto could not find him, so she took a cab home  (Tr. III/37-38).

-22-

After Biggs was arrested, Patuto continued to
see him   (Tr. III/42).   He denied knowing the Complainant
(Tr. III/42).  About six months later, however, Biggs
admitted knowing the Complainant; that they had  met
at a few parties, and on November 16, 1997, Biggs
had encountered the Complainant on Glenville Avenue,
when he slipped on the snow  (Tr. III/42-44).
Biggs and the Complainant then walked to his apartment
and went inside  (Tr. III/44).  After looking at some
poetry, they started kissing, and eventually engaged
in sex  (Tr. III/45).  Feeling bad that the Complainant
was having problems with her boyfriend, Biggs gave
her a bracelet that was his mother's  (Tr. III/45).$\frac{7}{}$

While in custody awaiting trial, Biggs wrote
many letters to Patuto and to a friend, Allen Tanner,
in which he discussed his upcomming trial  (Tr. III/
46-50; Tr.IV/98, 106-107, 111, 123, 140).  Sanitized
copies of the letters were admitted over the Petitioner's

_____

7/   The Commonwealth argued, without evendentiary
     support that Biggs had concocted this version
     of the events after learning that semen consistent
     with his blood and DNA type was found in the
     specimens taken from the Complainant's clothing
     and body (Tr. III/88-92, 118, 121; Tr. IV/219-
     220).

-23-

objection (Tr. III/48-51). The Commonwealth attempted
to show, through the letters, that Biggs fabricated
a defense and attempted to influence witnesses regarding
the content of their testimony.    Biggs denied the
allegations, stating that he was merely attempting
to round up witnesses, and that at one point he discharged
his lawyer and anticipated representing himself  (Tr.
IV/98, 107, 110).   This action led him to discuss
trial strategy with Patuto    (Tr. IV/111-117).   Patuto
denied that Biggs had ever asked her to lie or to
enlist others to lie if they testified at Biggs' trial
(Tr. III/73-74, 78).

Biggs testified that he met the Complainant during
the summer of 1997, while living at 50 Parkvale Avenue
in Brighton  (Tr. IV/10, 12).  Biggs stated that he
first met her at a few establishments in the neighborhood
(Tr. IV/12-13), 17-18) and in August they spent time
getting to know each other at a neighborhood party
(Tr. IV/14-16).   In September, 1997, Biggs saw the
Complainant a few times a week at Marty's Liquors,
where he worked  (Tr. IV/18-19).

On November 15, 1997, after attending an anniversary
party at the Days Inn with Patuto and Julie, where

-24-

Biggs and Patuto shared a rum and coke and three beers,
Biggs and Patuto went to Biggs apartment, where each
drank a beer and had a sip of scotch (Tr. IV/19-21).
Twice, Biggs left the apartment to visit some people
who lived accross the street (Tr. IV/21-22).   When
he returned the second time, Patuto was gone, and
he was unable to find her (Tr. IV/23).

The ground was wet and slippery, and while walking
home, Biggs slipped (Tr. IV/23).   The Complainant
happened to be in the area, and approached him (Tr.
IV/23-24).   They talked, and Biggs invited the Complainant
to his apartment, and the Complainant read some poems
Biggs wrote about his mother (Tr. IV/29-30).   When
Biggs began to cry, the Complainant comforted him,
one thing led to another, and the two eventually engaged
in consensual sex (Tr. IV/30-38).

It was at this point that the Complainant told
Biggs that she had a relationship with another man,
who was sometimes jealous and possessive (Tr. IV/38-
39).   Biggs offered to speak with him, and also suggested
that the Complainant study karate so she could defend
herself (Tr. IV/39-40).   It was at this point that

-25-

the Complainant turned cold and showed a sudden urge
to leave   (Tr. IV/39-41).

Biggs did not tell the police or Patuto the truth
about this encounter with the Complainant because
he was freightened and humiliated  (Tr. IV/45-46).
Biggs did not think the police would believe him if
he told them the truth  (Tr. IV/ 138-139).  However,
Biggs later told Patuto the truth  (Tr. IV/46).  Because,
Biggs had lost faith in his attorney, John C. McBride,
he began to take legal classes while in custody,
anticipation his requirement that he would be forced
to represent himself  (Tr. IV/48, 112, 114).  In a
lewtter to Patuto, he requested assistance from her
in rounding up percipient and character witnesses,
and discussed his strategy, but had never asked anyone
to lie for him  (Tr. IV/46-48, 99, 105-106, 141-143).

During Biggs testimony the prosecutor, over objection,
haranged Biggs about his right to present a defense,
and particularly, his right to show reasonable doubt
and challenge the evidence against him  (Tr. IV/112-
115).  Further, the prosecutor harped on Biggs and

-26-

Patuto about Biggs letters discussing his trial strategy, which focused on "planting reasonable doubt" and did not mention anything about "finding the truth" and "finding the Facts." (Tr. IV/112-115, 124-126; Tr. III/59).$\underline{8/}$

Other relevant facts will be set forth within the arguments, where deemed relevant.

---

$\underline{8/}$  Initially, the Trial Judge sustained Trial Counsel's objections (Tr. IV/113), but as the prosecutor stepped up her questions, Trial Counsel's objections were overruled (Tr. IV/113-115).

## ARGUMENT

I.   THIS HONORABLE COURT SHOULD DENY THE RESPONDENT'S
     MOTION TO DISMISS BASED UPON THE FAILURE TO EXHAUST
     STATE REMEDIES AND TO ALLOW THE PETITIONER'S
     REQUEST FOR A STAY OF THE HABEAS CORPUS PROCEEDINGS
     IN ORDER TO ALLOW THE PETITIONER TO RETURN TO
     STATE COURT TO EXHAUST STATE REMEDIES ON CERTAIN
     ISSUES, WHERE THE PETITIONER CAN SHOW GOOD CAUSE
     FOR THE FAILURE TO EXHAUST IN THE FIRST INSTANCE,
     THE ISSUES WHICH PETITIONER WILL PRESENT ARE
     MERITORIOUS AND THAT THE FAILURE TO GRANT THE
     REQUESTED STAY WOULD TIME BAR THE PETITIONER
     FROM ALL HABEAS CORPUS PROCEEDINGS ON HIS
     MERITORIOUS CLAIMS _____

     1.   Standard Of Review For Requested Stays Of
          Habeas Corpus Proceedings Under Rhines v.
          Weber, 544 U.S. ___, 125 S.Ct. 1528, 161
          L.Ed.2d 440 (2005): _____

     Recently in Rhines v. Weber, 544 U.S. ___, ___,

125 S.Ct. 1528, ____, 161 L.Ed.2d 440, 452 (2005),

the United States Supreme Court held and for the first

time sanctioned the use of a "Protective" habeas corpus

petition, which could be filed in a federal district

court, notwithstanding a petitioner's failure to exhaust

all state remedies.  This procedure, the Court stated

would allow a federal district court to grant a stay

of the habeas corpus proceedings on such conditions

as the court would impose, which would allow the

-28-

petitioner to return to the state court in order to
exhaust all unexhausted claims, and then return to
the federal court for review of the perfected petition.
In so ruling, the Court realized that a blanket
prohibition of a stay and abeyance procedure, would
sometimes have the result of effectively barring a
petitioner from all access to federal habeas corpus
proceedings, primarily due to the strict statute of
limitations set forth in 28 U.S.C. § 2244(d)(1) having
expired after exhaustion in the state court.  Thus,
the holding in Rhines v. Weber in this regard is
consistent with First Circuit practice prior to
Rhines v. Weber, which had previously approved and
strongly recommended that the "stay and abeyance"
procedure, particularly where dismissal might result
in a total ban of federal habeas corpus relief altogether.
Veverson v. Farquharson, 366 F.3d 32, 42-43 (1st Cir.
2004); Delaney v. Matesanz, 264 F.3d 7, 14 & n. 5
(1st Cir. 2001).  Further, this Honorable Court has
also approved of this practice of "stay and abeyance",
prior to the holding in Rhines v. Weber.  Gaskins

v. Duval, 336 F.Supp.2d 66, 68-69 (D.Mass. 2004);
Laurore v. Spencer, 267 F.Supp.2d 131, 137-138 & n.
3 (D.Mass. 2003)(stay of habeas corpus proceedings
granted where petitioner would be time barred if he
returned to federal court after exhaustion).

However, in Rhines v. Weber,  544 U.A. at ___-
___, 161 L.Ed.2d at 451-452, the Court in reaching
its result set forth guidelines which must be first
met.  First, and foremost, is the requirement that
the petitioner show "good cause" for the failure to
exhaust claims first in the state court in order for
this "stay and abeyance procedure" to take place.$\frac{9/}{}$
In clarifying this terminology "good cause", the court
likened this phrase with a good excuse for not filing
first in state court, as expounded upon in Pace v.
DiGuglielmo, 544 U.S. at ___, 161 L.Ed.2d at 768 and
coupled this requirement of a meritorious issue to

_____

9/    In Pace v. DiGulielmo, 544 U.S. ___, ___, 125
      S.Ct. ___, ___, 161 L.Ed.2d. 669, 678 (2005)
      held that a petitioner's reasonable confusion
      about whether a state court filing would be timely
      would ordinarily constitute "good cause" for
      a petitioner to file in the federal court in
      the first instance, citing  Rhines v. Weber,
      supra.

-30-

be exhausted, with the additional factor that there be an absence of "intentionally dilitory litigation tactics" by the petitioner. Rhines v. Weber, 544 U.S. at ___-___, 161 L.Ed.2d at 452-453 and cited with approval in Pace v. DiGuglielmo, 544 U.S. at ___, 161 L.Ed.2d at 678.$\frac{10}{}$ Thus, if this Honorable Court makes the determination that the "good cause" required for the issuance of a stay in this case is synonymous with a meritorious issue to be brought back to the state court to be exhausted or is the same "cause" utilized to excuse a procedurally defaulted claim, then the petitioner's claims of ineffective assistance of trial and appellate counsel should be sufficient in this case, with the additional reason as to why the petitioner failed to raise them in the state court earlier. One such reason, which the Petitioner is raising here is his lack of knowledge of the law, as well as the fact that the petitioner

---

10/    However, Justice Souter, concurring in part and
       concurring in the judgment would not use the
       "good cause" standard for fear that it would
       cause the federal district courts to be too much
       trouble to be worth the effort, but rather would
       condition a stay upon a lack of "intentionally
       dilitory litigation tactics" by the petitioner.
       Id., 544 U.S. at ___, 161 L.Ed.2d at 453(Justice
       Souter, with whom Justices Ginsberg and Breyer
       join, concurring in part and concurring in the
       judgment).

could not expect either trial or appellate counsel
to raise their own effectiveness and therefore such
claims should be properly raised in a post-conviction
proceeding, such as under Rule 30(b), Massachusetts
Rules of Criminal Procedure, 435 Mass. 1501 (2001),
something of which is recommended under existing law.
See, Massaro v. United States, 538 U.S. 500, 506-509
(2003)(a convicted prisoner may properly first bring
an ineffective assistance of counsel claim in a collateral
proceeding regardless of whether  a defendant could
have raised the ineffective claim on direct appeal
and this procedure does not result in a procedural
bar of the issue being brought in a collateral proceedig).
Moreover, pursuant to the United States Supreme Court's
suggestion in Massaro v. United States, 538 U.S. at
508-509, the Commonwealth of Massachusetts is presently
in the process of formally adopting the collateral
proceeding rule as adopted in Massaro, in the pending
case of Commonwealth v. Lawrence Zinser, Supreme Judicial
Court number SJC-09516, which date for oral argument
has been tentatively set for October, 1005, as outlined
in the Massachusetts Lawyer's Weekly, 33 MLW 2460

-32-

July 11, 2005 Ed.)(announcement that Supreme Judicial

Court is soliciting amicus briefs on whether the court

should adopt the rule in Massaro v. United States).$\frac{11}{}$

This request for a stay of the habeas corpus

proceedins and Opposition to the Respondent's Motion

to Dismiss is governed by the above-cited cases.

As will be shown below, the Petitioner will show

that there exists good cause for the failure of the

Petitioner to raise the unexausted issues earlier,

that there was no "intentional dilitory litigation

tactics" by the Petitioner in this case and that the

issues sought to be exhausted are meritorious and

stand more than a reasonable likelihood of success

on the merits of the issues, all of which should show

that the Petitioner clearly meets the criteria and

guidelines set down in Rhines v. Weber, 544 U.S. at

___-___, 161 L.Ed.2d at 452-453 to be granted a

_____

11/  At present, however, there is a conflict in rulings
     as to when claims of ineffective assitance of
     trial and appellate counsel must be raised. See,
     Commonwealth v. Frisino, 21 Mass. App. Ct. 551,
     553-556 (1986)(where ineffective claim apparent
     on record, no motion for a new trial need be
     filed); Commonwealth v. Cormier, 41 Mass. App.
     Ct. 76, 77 (1996)(claim of ineffective assistance
     of appellate counsel raised in Rule 30 motion
     after direct appeal, no waiver found).

-33-

protective stay and to hold the petition for habeas
corpus in abeyance, until such time as the Petitioner
returns to state court to exhaust his state remedies
and then return to this Honorable Court with the perfected
issues.

    2.    The Petitioner Can Show Good Cause For Not
          Exhausting His State Remedies On Certain
          Issues Prior To Bringing The Habeas Corpus
          Petition With Unexhausted Issues:

    Under the holding in Rhines v. Weber, 544 U.S.
at ___-___, 161 L.Ed.2d at 451-452, the Petitioner
must show "good cause" for the failure to exhaust
claims first in state court. As will be shown below,
the Petitioner will make this showing based on several
distinct and good faith grounds.

    First of all, the Petitioner is unfamiliar with
the law, especially the guidelines and procedures governing
habeas corpus proceedings, that the Petitioner has
attempted to learn the law, but was unable to do so
in time to file a motion for a new trial in state
court and or file a habeas corpus petition (P.Aff.,
pp. 7-8, ¶¶ 17-20). However, notwithstanding the
fact that the Petitioner attempted to learn law on
his own, the Petitioner also sent numerous letters

-34-

to law schools, attorneys and legal services agencies
to seek assistance  (P.Aff., pp. 6-8, ¶¶ 15-20; P.Exh.
1-2).   As shown from the correspondence received
back from the above-mentioned, absolutely none of
them, except for the Committee for Public Counsel
Services could assist the Petitioner and only if the
Petitioner could come up with legal issues on his
own   (P.Aff., pp. 6-9, ¶¶  15-21; P.Exh. 1-2).

     Moreover, the inmate law clerks at the correctional
institution, where the Petitioner is currently located
are familiar with or have been trained in federal
habeas corpus proceedings.   However, once the Petitioner
was able to secure some assistance from another inmate,
who does not work in the prison law library and who
is a paralegal, this inmate immediatly read the Petitioner's
transcripts and documents in the Petitioner's case,
performed legal research to isolate issues in Petitioner's
case, which he deemed meritorious, the time limits
on the Petitioner's filing the federal habeas corpus
petition were expring  (P.Aff., pp. 7-9, ¶¶ 17-23;
P.Exh. 1-2).   At the same time, the Petitioner immediately
contacted Attorney David Nathanson at the Committee

for Public Counsel Services and had the inmate paralegal
explain to him the legal issues which had been isolated.
Thereafter, Attorney Nathanson directed the Petitioner
to send him an outline of the new trial issues and
the portions of the relevant transcripts and documents
and that he would assign counsel to assist the Petitioner
(P.Aff., pp. 7-9, ¶¶ 17-20; P.Exh. 1-2).  However,
if the inmate paralegal did not draft the Petitioner's
habeas corpus petition and the pleadings being filed
here, as well as isolate all legal issues, the time
limits on this habeas corpus petition would have expired
and the Petitioner would be forever barred from filing
a federal habeas corpus petition.  Moerover, due to
the time limits expiring on the Petitioner's filing
of the habeas corpus petition and being unable to
determine if the motion for a new trial would be filed
in time to stop the applicable statute of limitations,
the Petitioner filed the present protective habeas
corpus in this court.  However, should this request
for a stay of the habeas corpus proceedings be denied,
the Petitioner will be forever time barred from any

federal habeas corpus proceedings in the future  (P.Aff.,
pp. 6-9, ¶¶ 15-23; P.Exh. 1-2).

Finally, the additional reason for the Petitioner
not having presented the unexausted issues to the
state court sooner, is that the Petitioner received
ineffective assistance of both trial and appellate
counsel, and it would not have been reasonably expected
to have either one raise their own ineffectiveness
within the claims presented to the court.  Massaro
v. United States, 538 U.S. at 506-509, coupled with
the other factors submitted herein, clearly show that
the Petitioner did everything in his power to move
this case along and to file a motion for a new trial
before coming to this Honorable Court.  Thus, one
may conclude that the Petitioner did not utilize any
"intentional dilitory litigation tactics" and all
attempts by the Petitioner were made in good faith
to btain relief and the Respondent within their Motion
to Dismiss has not set forth any ground which would
show an "intentional dilitory litigation tactic" in
this case and because the Petitioner is not a capital
Petitioner and therefore the presumption in the Petitioner's

-37-

"principle interest ... in obtaining speedy federal relief on his claims" is especially applicable here, where he did everything possible from day one to move the case along.  Rhines v. Weber, 544 U.S. at ___, 161 L.Ed.2d at 452.    Thus, for the reasons set forth herein, the Petitioner's request for a stay of the habeas corpus proceedins should be allowd.

   3.    The Grounds Which The Petitioner Is Seeking
         A Stay Of The Habeas Corpus Petition In
         Order To Return To The State Court To Exhaust
         His State Remedies Are Meritorious: _____

      In Rhines v. Weber, 544 U.S. at ___, 161 L.Ed.2d at 452, the Court held that it would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims which are potentially meritorious.  As will be shown more fully below, each and every issue which the Petitioner has not exhausted and seeks leave to return to state court to exhaust are clearly meritorious and have a reasonable likelihood on the merits, thus warranting the stay to be issued in this case.

A.    Standard Of Review For Claims Of
      Ineffective Trial And Appellate
      Counsel Under The Sixth Amendment:

The Sixth Amendment right to counsel and the
right to effective assistance of counsel protect the
fundamental right to a fair trial.  Strickland v.
Washington, 466 U.S. 668, 687 (1984).  To establish
ineffective assistance of counsel, a petitioner must
show that: (1) counsel's errors were so serious that
"counsel was not functioning as the 'counsel' guaranteed
the defendant by the Sixth Amendment;" and, (2) counsel's
deficient performance prejudiced the defense.  These
two components are mixed questions of fact and law.
Id., 466 U.S. at 698.    Further, "[t]here is no reason
for a court deciding an ineffective assistance claim
... to address both components of the inquiry if the
defendant makes an insufficient showing on one."
Id., 466 U.S. at 697.

With respect to the performance prong of the
Strickland test, a strong presumption exists that
counsel's behavior lies within the wide range of
reasonable professional assistance.  Id., 466 U.S.

-39-

at 689.  Additionally, "[D]efendant must overcome
the presumption that, under the circumstances, the
challenged action 'might be considered sound trial
strategy.'"  Id., 466 U.S. at 689(citation omitted).
Moreover, "[t]he court should recognize that counsel
is strongly presumed to have rendered adequate assistance
and made all significant decisions in the exercise
of reasonable professional judgment."  Id., 466 U.S.
at 690.  With respect to the prejudice prong, the
reviewing court must determine, based on the totality
of the evidence before the factfinder, "whether there
is a reasonable probability that, absent the errors,
the factfinder would have had a reasonable doubt respecting
guilt."  Id., 466 U.S. at 695.

     Finally, in the appellate counsel context, a
showing of prejudice requires showing that petitioner's
claims would have succeeded on appeal.  Smith v. Robbins,
528 U.S. 259, 285-286 (2000).

     This below listed issues are governed by the
above-cited cases.

     Here, the Petitioner will show in the claims
listed below, that the Petitioner was denied the effective

assistance of Trial Counsel, when Trial Counsel: (1)
failed to properly observe, object and take certain
corrective measures, when the prosecutor utilized
peremptory challenges to attempt to exclude all african-
american jurors from the panel in violation of Batson
v. Kentucky, 476 U.S. 79 (1986) and failed to preserve
the issue for appellate review; (2) trial counsel
failed to properly observe, object and properly preserve
for appellate review, the Trial Court's erroneous
instructions to the jury on the crimes of aggravated
rape, where the Trial Court's instructions permitted
the jury to find guilt on an attempted kidnapping,
a cahrge which was neither presented to the grand
jury nor set forth in the indictments returned by
the grand jury; (3) that Trial Counsel abandoned his
trial strategy by failing to ask the Complainant how
the Petitioner had known about certain intimate facts
of the Complainant's life and family, if the Complainant
never met the Petitioner previously and testified
that she did not know the Petitioner, where such questions
would have severely and substantially undermined the
Complainant's credibility that the Complainant had

-41-

been kidnapped and raped by the Petitioner, where the sole issue to be decided at trial was the credibility of the Complainant and the Petitioner; (4) that Trial Counsel failed to observe and properly request that the Trial Court instruct the potential jurors as to the definitions of the presumption of innocence and the definition of proof beyond a reasonable doubt under the statutory mandate of M.G.L. c. 234, § 28, for the purpose of determining whether the jurors could understand the concepts and abide by them, as a prerequisite to be seated as jurors; and, (5) that Trial Counsel failed to observe, object and preserve for appellate review the Trial Court's jury instructions on circumstantial evidence, which used the words "moral certainty", without accompanying language which lent meaning to the phrase and the erroneous jury instruction was so far removed with the general instructions on proof beyond a reasonable doubt and the Trial Court never explained or corrected the infirm language to the jury.

Moreover, Appellate Counsel's failure to raise the above-issues on appeal or in a motion for a new

trial constitutes ineffective assistance of appellate
counsel, where such issues, if raised properly, would
have prevailed and resulted in a reversal of the
convictions and a new trial gievn to the Petitioner,
and which were clearly stronger than the issues raised
by appellate counsel.  Smith v. Robbins, 528 U.S.
at 285-286.

   B.  Trial And Appellate Counsel Were Ineffective
       In Failure To Observe, Object And Properly
       Preserve For Appellate Review The Prosecutor's
       Race Based Peremptory Challenges To All
       Eligible African American Jurors In Violation
       Of Batson v. Kentucky, 476 U.S. 79 (1986)
       And Appellate Counsel's Failure To Raise
       Trial Counsel's Ineffectiveness Amounted
       To, Under The Circumstances To Ineffective
       Assistance Of Appellate Counsel, Which Would
       Have Prevailed, If Raised:

   In Batson v. Kentucky, 476 U.S. 79, 89 (1986),
the Supreme Court held that a prosecutor is forbidden
from challenging potential jurors solely on the basis
of their race or on assmptions about african-american
jurors as a group.  In reaching this decision, the
Court established a three-part framework for considering
challenges to a prosecutor's use of peremptory challenges.
First, the defendant must establish a prima facie
case of purposeful racial discrimination by the prosecutor

-43-

in her use of peremptory challenges "by showing that
the totality of the relevant facts gives rise to an
inference of discriminatory purpose." Id., 476 U.S.
at 93-94, citing Washington v. Davis, 426 U.S. 229,
239-242 (1976) and cited with approval in Johnson
v. California, 544 U.S. ___, 125 S.Ct. ___, 161 L.Ed.2d
___, U.S. No. 2004-6964, Criminal Law Reporter, Volume
77, No. 11, pages 278, 280-281 (June 15, 2005).$\frac{12/}$
This inference, which the court spoke about within
the Batson standard has been defined as generally understood
to be a "conclusion reached by considering other facts
and deducing a logical consequence from them." Johnson
v. California, 544 U.S. at ___ & n. 4, 77 CLR at 280
& n. 4, quoting Black's Law Dictionary 781 (7th Ed.
1999).    However, recently, the Supreme Court in Johnson
v. California, rejected the standard adopted by the
State of California,  in step one of Batson which

---

12/  Due to the fact that the Petitioner does not
     have access to an official or unoficial cite
     of the Johnson v. California, case, Petitioner
     has attached a copy of the case from the Criminal
     Law Reporter, Volume 77, No. 11 as Exhibit 1
     to this Memorandum.  All citations to that case,
     therefore will be cited as "77 CLR, p. ___,"
     with respective page number designated.

-44-

required that "the objector must show that it is more
likely than not the other party's peremptory challenges,
if unexplained, were based on impermissible group
bias" and conluded that the "more likely than not"
standard is an inappropriate yardstick by which to
measure to sufficiency of a prima facia case.  Id.,
544 U.S. at ___, 77 CLR at 280.    Instead the Johnson
Court reiterated the first prong of Batson  as:

> "a defendant may establish a prima
> facie case of purposeful discrimination
> in selection of the petit jury solely
> on evidence concerning the prosecutor's
> exercise of peremptory challenges at
> the defendant's trial.   To establish
> such a case, the defendant must first
> show that he is a member of a cognizable
> racial group, and that the prosecutor
> has exercised peremptory challenges
> to remove from the venire members of
> the defendant's race.   Second, the
> defendant is entitled to rely on the
> fact, as to which there can be no dispute,
> that peremptory challenges constitute
> a jury selection practice that permits
> 'those to discriminate who are of mind
> to discriminate.'   Finally, the defendant
> must show that these facts and other
> relevant circumstances raise an inference
> that the prosecutor used that practice
> to exclude the veniremen from the petit
> jury on account of their race."

Id., 77 CLR at 280-281, citing Batson v. Kentucky,
476 U.S. at 96(citations omitted), quoting Avery v.

-45-

Georgia, 345 U.S. 559, 562 (1953).

Once the first step is met, the second step in the Batson inquiry is that once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately, the racial exclusion" by offering a permissible race neutral justification for the strikes. Johnson v. California, 544 U.S. at ___, 77 CLR at 280, citing Batson v. Kentucky, 476 U.S. at 94, see also: Alexander v. v. Louisiana, 405 U.S. 625, 632 (1972). This second test under Batson is not that the prosecutor's reason is persuassive, but that it does not deny equal protection. Purkett v. Elam, 514 U.S. 765, 769 (1995). However, a prosecutor has failed to meet the second step of the Batson standard, if the explanations are not sufficiently "clear and reasonable specific," United v. Chinchila, 874 F.2d 695, 698 (9th Cir. 1989), or "objectively contrary to the facts." McClain v. Prunty, 217 F.3d 1209, 1221 (9th Cir. 2000). "Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive, or 'affirm[ing] [his] good faith in making individual selection'", Batson v.

Kentucky, 476 U.S. at 98, quoting Alexander v. Louisiana, 405 U.S. at 632, because "[i]f these general assertions were accepted as rebutting the defendant's prima facie case, the [constitutional protections] 'would be but ... vain and illusory requirement[s].'" Id., 405 U.S. at 632, quoting Norris v. Alabama, 294 U.S. 587, 598 (1935).

After, the prosecutor's explanation is given, the third standard of the Batson standard must be given consideration and the trial judge must decide, first, whether the prosecutor has given a race-neutral explanation, and second the trial court must then decide whether the opponent of the strike "has proved purposeful racial discrimination."   Batson v. Kentucky, 476 U.S. at 96-98; Purkett v. Elam, 514 U.S. at 767; Hernandez v. New York, 500 U.S. 352, 359 (1991)("Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination."). This doscriminatory intent evaluation turns largely on the trial court's evaluation of the prosecutor's credibility because "'[t]he credibility of the prosecutor's explanation goes to the heart

of the equal protection analysis.'"  Hernandes v.
New York, 500 U.S. at 367.

This issue is governed by the above-cited cases.

Here, during the jury selection process in this
case, the Commonwealth, through the prosecutor challenged
every single eligible african-american person on the
panel, which consisted of Stephanie Norris, Diane Ellis
and last was Lawrence Hunter  (Tr. I/98-104, 117-120).
After the second african-american, Diane Ellis had
been challenged, Trial Counsel objected and brought
the matter to the Trial Court's attention  (Tr. I/101-
104).    After the Trial Judge requested an explanation
from the prosecutor as to the reason for the challenge,
the prosecutor gave the following explanation:

MS. KNIGHT:  Judge, it actually has to do with
some behavior that I observed outside the courtroom
with this witness(sic)(juror).

THE COURT:  Well, what was the behavior?

MS. KNIGHT: She was rather rude and inapprpriate
about coming into the courtroom and was delaying.
And I just observed something and I decided at that
time if she was to be a potential juror that she would
be somebody I would strike.

THE COURT:  I accept it.  But if there is another
challenge to a black, I am going to ask you to state
why.

(Tr. I/102-104).

-48-

After this exchange had taken place, the prosecutor falsely accused the Petitioner's trial counsel of challenging every single white female potential juror which had been presented to the court. This, the prosecutor knew was false, due to the fact that there were four white female jurors seated at the time of the prosecutor's false claims, the jurors were Juror number 2, Jaime Weinberg (Tr. I/32-34), Juror number 3, Beth Zailyn Noreiga (Tr. I/50-52), Juror number 4, Jennifer Couperus (Tr. I/69-71), and Juror number 5, Margaret Rizzo (Tr. I/75-78). Moreover, the falsity of the prosecutor's allegations are further bolstered by the fact that when Trial Counsel disagreed with the prosecutor, the prosecutor was able to state at least one white female juror's name, Juror number 3, Beth Zailyn Noreiga (Tr. I/104). At this point, the judge declared that she was not going to find a pattern at that point (Tr. I/104).

Thereafter, when several more jurors were seated the Commonwealth exercised its third challenge to an african-american male this time, Lawrence Hunter and at this point Trial Counsel requested another side bar conference   (Tr. I/117-118).   This time,

-49-

however, the court rejected the Commonwealth's challenge
and seated the juror because the Court found that
the juror did not give a race-neutral answer and instead
sought to justify the challenge because the juror
may have been in favor of the Commonwealth (Tr. I/118-
120). Due to this, the composition of the jury venire,
lus the two alternates consisted of one african-american
male (Tr. 117-120), Seven White Females (Tr. I/32-
34, 50-52, 69-71, 75-78, 104-105, 110-112, and Six
White Males (Tr. I/25-26, 96-97, 106-107, 126-129).

     However, notwithstanding the fact that the first
challenge to an african-american female went unquestioned
(Tr, I/98-99), that the second african-american female
who was challenged, the prosecutor gave a vague and
non specific reason for the challenge, which the court
allowed (Tr. I/102-104), the Commonwealth's attempt
to intimidate Trial Counsel into not making any more
objections to the Commonwealth's race-based challenges
by falsely accusing Trial Counsel of the same conduct,
which could be readily ascertained as false by the
record and showed consciousness of guilt on the part
of the prosecutor (Tr. I/102-104), the Trial Court's

-50-

failure to allow Trial Counsel to rebut or respond
to the Commonwealth's non-specific race neutral reason
for the second challenge to the second african-american
female  (Tr. I/102-104), the Trial Court's failure
to assess the credibility of the Commonwealth's second
race-based challenge and the reason given by the
prosecutor, especially in light of the false allegations
against Trial Counsel regarding the false claim that
he challenged all white female jurors, when there
were already four sitting as jurors  (Tr. I/104),
as well as Trial Counsel's failure to move the Court
for reconsideration of the two previously struck african-
american female prospective jurors, after race-based
peremptory challenges by the prosecutor were found
by the Trial Judge on the last african-american juror
(Tr. I/98-99, 102-104, 117-118).

From the above-facts, there are several violations
apparent from the record in this case regarding Batson
violations.  First, and foremost is the undisputed
fact that the Petitioner had established the first
prong of the Batson requirement, that being when the
prosecutor in this case sought to strike every single

-51-

eligible african-american juror on the panel and did
succeed in removing all african-american jurors, except
for one, which the Trial Court would not allow  (Tr.
I/118-120) and that this created an inference or prima
facie case of discrimination under Batson v. Kentucky,
476 U.S. at 94("a defendant may establish a prima
facie case of purposeful discrimination in selection
of the petit jury soely on evidence concerning the
prosecutor's exercise of peremptory challenges at
the defendant's trial); Johnson v. California, 77
CLR at 280-282(same); Commonwealth v. Calderon, 431
Mass. at 25-26(same).

Second, the Trial Court committed reversible
error, when the court failed to find that the second
challenge to the second african-american female was
non-specific and unclear.  United States v. Chinchilla,
874 F.2d at 698(reversal required, where prosecutor
failed to meet second step of the Batson standard
because his explanations were not sufficiently "clear
and reasonably specific"); Weddell v. Weber, 290 F.Supp.2d
1011, 1028-1030 (D.S.D 2003)(explanation about gut
feeling not sufficient to satisfy race neutral explanation

-52-

by prosecutor, conviction reversed; habeas corpus
issued).

Third, even assuming that the reason was sufficiently
clear and specific (without conceding that fact),
the explanation given by the prosecutor should still
have been rejected by the Trial Judge because the
reasons "rude", "inappropriate", "delaying" and "something"
(Tr. I/102-104), which are similar to a party's gestures,
can never form the basis for a race-neutral challenge.
Commonwealth v. Maldonado, 439 Mass. 460, 465 (2003)
(a juror's looks, gestures, or a party's gut feeling
should rarely be accepted as adequate because such
explanations can easily be used as pretexts for
discrimination"); Weddell v. Weber, 290 F.Supp.2d
at 1029(prosecutor's gut feeling about whether a juror
would be fair not sufficient race-neutral reason;
habeas corpus granted); Alexander v. v. Louisiana,
405 U.S. at 632("if .. general assertions were accepted
as rebutting a defendant's prima facie case, the
[constitutional protections] 'would be but ... vain
and illusory requirement[s]'"), quoting Norris v.
Alabama, 294 U.S. at 598.

-53-

Fourth, the Trial Court on the second challenge
to the african-american female, failed to conduct
the third step inquiry under Batson, because once
both Trial Counsel and the prosecution were heard,
the Trial Court was required to make an independent
evaluation of the prosecutor's grounds, that Trial
Counsel was not permitted or allowed to respond to
the grounds given by the prosecutor, and that there
was no determination as to whether the explanation
was credible, bona fide or pretextual, but the Trial
Court merely rubber stamped the proffered reason given
by the prosecutor, which error was compounded further
by the fact that right after the prosecution gave
the explanation, she falsely accused Trial Counsel
of the same conduct   (Tr. I/102-104).  This was error
requiring reversal of the Petitioner;'s convictions.
See, Commonwealth v. Calderon, 431 Mass. at 26-27(Judge's
independent evaluation of the reasons for exercising
a peremptory challenge and determining specifically
whether the explanation was credible, bona fide or
a pretext involves more than rubber stamping of proffered

-54-

reasons, it requires a meaningful consideration whether
the challenge has a substantive basis or is impermissibly
linked to a juror's race and due to Trial Court's failure
to perform this task, the Trial Court'sruling was
not entitled to the customary deference, where the
judge failed to follow proper procedure; judgments
reversed, new trial ordered); Lewis v. Lewis, 321
F.3d at 832(habeas corpus petition granted because
trial court failed to properly perform step three
of the Batson standard) Collins v. Rice, 365 F.3d
667, 686-687 (9th Cir. 2004)(third prong of Batson
not addressed by court; petition for habeas corpus
granted); Batson v. Kentucky, 476 U.S. at 98, n. 21
(a finding by a court "largely will turn on evaluation
of credibility); Wainwright v. Witt, 469 U.S. 412,
428 (1985)( the desisive factor in determining whether
a race-neutral explanation has been offered will often
be the demeanor of the attorney who exercises the
challenge as well as the credibility).

Because the issues raised above are more than
meritorious, Trial Counsel's failure to properly
object, perserve, move for reconsideration of the

-55-

Trial Court's allowance of the two african-american
female challenges by the prosecutor and move to seat
them as jurors constituted, under the circumstances
to ineffective assistance of Trial Counsel.  See,
Davis v. Secretary for Department of Corrections,
341 F.3d 1310, 1316-1317 (11th Cir. 2003)(Petitioner
established reasonable probability that state courts
would have reversed his conviction had his ineffective
trial counsel preserved his Batson claim for review
on appeal, and thus petitioner was entitled to have
writ of habeas corpus conditioned on state's reversal
of the petitioner's conviction).

Likewise, Appellate Counsel's failure to raise
Trial Counsel's ineffective assistance claims for
the failure to properly object, perserve and/or move
for reconsideration as set forth more fully above,
constituted, under the circumstances to ineffective
assistance of Appellate Counsel, because if this issue
had been raised, especially in light of the numerous
Batson issues, trial counsel would have been found
ineffective and because the issue here is more
meritorious than the ones raised by Appellate Counsel

-56-

ineffective appellate counsel would be properly found
in this case. Eagle v. Linahan, 279 F.3d 926, 938-
944 (11th Cir. 2001)(state appellate counsel's failure
to recognize factual or legal basis for ineffective
assistance of trial counsel claim or failure to raise
claim despite recognizing it and which if raised would
have resulted in a reversal of the petitioner's
convictions and a new trial granted constituted
ineffective assistance of appellate counsel); Grate
v. Stinson, 224 F.Supp.2d  496, 511-520 (E.D.N.Y.
2002)(defendant's appellate counsel was ineffective
for failing to argue that the government's exercise
of peremptory challenges during jury selection was
impermissibly based upon race in violation of Batson
v. Kentucky because outcome of defendant's appeal
would likely had been different had defendant's
appellate lawyer raised the Batson issue).

Thus from all the facts and issues presented
in this issue, the Petitioner would have prevailed
on several grounds of his Batson claim, that Trial
Counsel was ineffective for the failure to properly
preserve the Batson  issue and appellate counsel was

-57-

ineffective for the failure to raise Trial Counsel's

ineffectiveness on appeal, which, if raised, would

have resulted in a reversal of the Petitioner's convictions

and a new trial ordered.

   C.   Trial And Appellate Counsel Were Ineffective
        For The Failure Of Trial Counsel To Properly
        Observe, Object And Properly Preserve For
        Appellate Review The Trial Court's
        Unconstitutional Expansion Of The Indictments,
        Through Jury Instructions, Which Allowed
        The Jury To Convict The Petitioner Of Several
        Counts Of Aggravated Rape Based Upon The
        Crime Of Attempted Kidnapping, Something
        Of Which Was Neither Alleged At The Grand
        Jury Or Set Forth In The Indictments Returned
        And Appellate Counsel Was Ineffective For
        The Failure To Raise Trial Counsel's
        Ineffectiveness On Appeal And/Or Raise The
        Defective Indictment Issue On Appeal, Which
        Would Have Prevailed, If Raised And Was
        More Meritorious Than The Issues Raised
        On Petitioner's Direct Appeal:

     The ·Fifth, Sixth and Fourteenth Amendments to

the United States Constitution, as well as Article

12 of the Massachusetts Declaration of Rights, Constitution

of Massachusetts guarantee a criminal defendant the

right to be informed of the nature of the charges

against him, as well as to have the Commonwealth try

him on the charges, which the Grand Jury heard evidence

on and returned indictments on.  See, United States

-58-

v. Fornia-Castillo, 408 F.3d 52, 66-67 (1st Cir. 2005);
United States v. Murphy, 406 F.3d 857, 860-861 (th
Cir. 2005); United States v. Pedigo, 12 F.3d 618,
630-631 (th Cir. 1993); United States v. Harrill,
877 F.2d 341, 344 (5th Cir. 1989); Lucas v. O'Dea,
179 F.3d 412, 416-418 (6th Cir. 1999); Commonwealth
v. Miranda, 441 Mass. 783, 787 (2004)(Article 12 of
the Massachusetts Declaration of Rights prohibits
an amendment to an indictment, which materially alters
the work of the grand jury)   The Fifth, Sixth and
Fourteenth Amendments to the United States Constitution
as well as Article 12 of the Massachusetts Declaration
of Rights prohibit the constructive amendment of an
indictment by jury instruction or otherwise.   Lucas
v. O'Dea, 179 F.3d at 416-418(constructive amendment
to indictments through jury instructions are per se
prejudicial); United States v. Fornia-Castillo, 408
F.3d at 66-67(same); United States v. Pedigo,   12
F.3d at 631(same); United States v. Harrill, 877 F.2d
at 344(same).   It is also well settled law in the
Commonwealth of Massachusetts that a criminal defendant

-59-

cannot be convicted of a crime of an attempt under

an indictment or complaint lacking an allegation essential

to the crime proved, i.e. an overt act. Commonwealth

v. Lourenco, 438 Mass. 1018, 1019 (2003); Commonwealth

v.Graham, 62 Mass. App. Ct. 642, 645 (2004)(The crime

of "attempt[ing] to commit a crime" is set forth in

M.G.L. c. 274, § 6 and requires that the defendant

"engage[] in some overt act" toward the commission

of the crime), citing Commonwealth v. Burns, 8 Mass.

App. Ct. 194, 196 (1979)(which requires that if overt

act is not alleged in indictment it is fatally defective);

Commonwealth v.  Gosslin, 365 Mass. 116, 122 (1974)(same).

This issue is governed by the above-entitled

cases.

Here, the Petitioner was indicted on several

counts of aggravated rape and no allegation of an

overt act of an attempt was alleged therein. However,

in the jury instructions regarding the elements of

aggravated rape, the Trial Court gave the following

instructions to the jury:

> In order to prove the defendant guilty
> of aggravated rape, the Commonwealth
> must prove beyond a reasonable doubt
> that the rape was committed during the
> commission **or attempted commission of**
> **of the crime of kidnapping**(emphasis
> supplied).

(Tr. V/49).

-60-

This jury charge allowed the jury to convict
the Petitioner of the crime of aggravated rape on
the finding of an attempted kidnapping, something
of which the Petitioner was never indicted for nor
evidence of such attempt heard by the grand jury who
returned the indictments in this case and consequently
the indictments returned were materially altered
by the jury instructions of the Trial Court, which
is per se reversible error under existing law. See,
Commonwealth v. Lourenco, 438 Mass. at 1019(where
complaint did not alledge an overt act charging an
attempt, it was reversible error to convict the defendant
of attempted kidnapping; judgement reversed and finding
of guilt set aside); Lucas v. O'Dea, 179 F.3d at 416-
418(constructive amendment of indictment through jury
instructions is reversible error per se).

Moreover, Trial Counsel's failure to observe,
object and preserve the constructive amendment of
the indictment issue for appeal constituted ineffective
assistance of Trial Counsel. Lucas v. O'Dea, 179 F.3d
at 418-419(ineffective assistance of counsel found,
where jury instructions contructively amended indictment

-61-

and trial counsel failed to observe or object to indictment or jury instruction; habeas corpus relief granted). Likewise, the failure of Appellate Counsel to raise this issue on appeal or claim trial counsel's ineffectiveness for the failure to raise the issue, which would have prevailed and which were more meritorious than the issues raised constituted ineffective assistance of appellate counsel. See, Sanders v. Cotton, 398 F.3d 572, 584-585 (7th Cir. 2005)(ineffective assistance of appellate counsel found, where appellate counsel failed to raise incorrect jury instructions on appeal which would have resulted in new trial being granted; habeas corpus petition granted).

Thus, the Petitioner would substantially pervail on this ground alone as a matter of law.

D. Trial And Appellate Counsel Were Ineffective For The Failure Of Trial Counsel To Observe, Object And Properly Preserve For Appel The Trial Court's Unconstitutional Jury Instructions On Circumstantial Evidence Which Lowered The Commonwealth's Burden Of Proof To Less Than Beyond A Reasonable Doubt And Appellate Counsel's Failure To Raise The Issue On Appeal Or Trial Counsel's Ineffectiveness, Which Would Have Prevailed Amounted To Ineffective Assistance Of Appellate Counsel

The Sixth and Fourteenth Amendment to the

United States Constitution require that the government
burden of proof is beyond a reasonable doubt of every
element which constitutes the rcime charged.   In Re
Winship, 397 U.S. 358, 364 (1970); Sullivan v. Lousiana,
508 U.S. 275, 278 (1993); Victor v. Nebraska, 511
U.S. 1, 5 (1994).  The term "moral certainty" to describe
the juror's frame of mind in considering whether there
is proof beyond a reasonable doubt is no longer acceptable.
Id., 511 U.S. at 7.  In Massachusetts, where stroger
language has accompanied the phrase with stronger
language such as "abiding conviction", is constitutionally
proper.  Commonwealth v. Labriola, 430 Mass. 569,
570-575 (2000).  However, it is a term, which should
be avoided in isolation, when explaining the government's
burden of proof.  Victor v. Nebraska, 511 U.S. at
6.    Moreover, circumstantial evidence is sufficient
evidence to prove guilt beyond a reasonable doubt
and are therefore contral to a jury charge describing
that burden of proof.  Indeed, the original jury charge
on proof beyond a reasonable doubt was derived from
the jury charge explaining the burden of proof in
circumstantial evidence case, the original of which

-63-

was in <u>Commonwealth v. Webster</u>, 59 Mass. (5 Cush.)
295, 312 (1850)(jury charge on proof beyond reasonable
doubt describing burden of proof in utilizing
circumstantial evidence).

This issue is governed by the above-cited cases.

Here, the Trial Court in explaning the burden
of proof in the use of circumstantial evidence used
the terminology "moral certainty", without any accopanying
language which would lend meaning to the phrase  (Tr.
V/12-17), although the terminology "clear and settled
belief" was accompanied with the phrase  (TR. V/16-
17).  Moreover, this instruction on circumstantial
evidence was far removed from the jury instructions
on the definition of proof beyond a reasonable doubt
(Tr. V/35-36), and which also did not explain the
infirm language or corect the infirm language regarding
the burden of proof utilizing circumstantial evidence
(Tr. V/12-17, 35-36). <u>Cupp v. Naughten</u>, 414 U.S. 141,
146-147 (1973)(only where the infirm language is explained
is instructional error not a violation of due process

-64-

where instructional error was cured by curative instruction).
A "strong probability is not enough". Commonwealth
v. Byers, 62 Mass. App. Ct. 148, 151-152 (2004).
Simply put, no court has ever approved of the language
"clear and settled belief" to lend meaning to the
hrase "moral certainty". Cf., Commonwealth v. Denis,
442 Mass. 617, 624-625 (2004)(identifying language
which lends meaning to phrase :moral certainty" no
error found). Consequently, the jury instructions
on circumstantial evidence lowered the Commonwealth's
burden of proof to less than beyond a reasonable doubt
under Victor v. Nebraska, 511 U.S. at 16. See also:
Mullings v. Meachum, 864 F.2d 13, 15-16 (2nd Cir.
1988).

Moreover, the failure of trial counsel to observe,
object and properly preserve this issue for appeal
amounted to, under the circumstances to ineffective
assistance of Trial Counsel. Commonwealth v. Kane,
19 Mass. App. Ct. 129, 142 (1984)(ineffective assistance
of Trial Counsel found were counsel failed to observe
and object to improper jury instructions on reasonable
doubt, presumption of innocence and other instructional
errors); Brown v. United States, 167 F.3d 109, 110-

-65-

111 (2nd Cir. 1999)(Trial Counsel was ineffective

for the failure to raise on appeal obviously deficient

reasonable doubt instructions).  Likewise, the failure

of Appellate Counsel to raise the erroneous jury

instruction issue on appeal constituted ineffective

assistance of Appellate Counsel, because, if raised

it had more than a reasonable likelihood on the merits,

which would have resulted in anew trial being granted

to the Petitioner and which was more meritorious than

the ones appellate counsel raised.  See, Sanders v.

Cotton, 398 F.3d 572, 584-585  (7th Cir. 2005)(ineffective

assistance of appellate counsel found for failure

to raise instructional error issue on appeal, which

would have prevailed).

     Consequently, there is more than a reasonable

likelihood of success on this issue.

          D.    Trial Counsel's Failure To Observe, Object
                And Preserve For Appeal, the Trial Court's
                Failure To Define Proof Beyond A Reasonable
                Doubt And Defining The Preumption Of Innocence
                To The Prospective Jurors To See If They
                Could Understand And Abide By Both Of Them,
                Under The Statutory Mandate Of M.G.L. c.
                234, § 28 Resulted In Ineffective Assistance
                Of Trial Counsel And The Failure To Raise
                Trial Counsel's Ineffectiveness On Appeal
                Constituted Ineffective Assistance Of Appellate
                Counsel

     M.G.L. c. 234, § 28 mandates that the Trial Court

                              -66-

question prospective jurors if the juror understands
that a defendant is presumed innocent until proven
guilty and that the Commonwealth has the burden of
proving the defendant guilty beyond a reasonable doubt
and if the juror does not so understand, another shall
be called in his stead. Id. This statutory mandate
requires the judge to give explanations to the jury
on both proof beyond a reasonable doubt and the presumption
of innocence, in order that the prospective jurors may truly
evaluate the concepts and abide by them. Commonwealth
v. Stellberger, 25 Mass. App. Ct. 148, 150 (1987)
(reversible error in Massachusetts to fail to define
the concept of proof beyond a reasonable doubt);
Commonwealth v. Grace, 381 Mass. 753, 761 (1981)(same;
and court must define proof beyond a reasonable doubt);;
Commonwealth v. Drayton, 386 Mass. 39, 46 (1982)(if
requested, defendant entitled to charge on presumption
of innocence).

     This issue is governed by the above-cited cases.

     Here, the Trial Judge merely asked the jurors
if they could understand the concept and abide by
the concept of a defendant being presumed to be innocent

-67-

until proven guilty and that the prosector has the
burden of proof beyond a reasonable doubt, but merely
asked the jury if they could not abide by the concept
(Tr. I/16-17). However, the problem with not explaining
the concept in accordance with the statutory mandate
is that at least one juror had problems understanding
the concept and was excused from the panel (Tr. I/54-
56). Had the Trial Court given definitions of both
concepts, that and other jurors might not have been
excused from the jury.

Because this was a statutory mandate under M.G.L.
c. 234, § 28, the failure to explain to the jury the
concepts rendered the statute meaningless.

Moreover, because Trial Counsel failed to request
an instruction on the concepts, which were required
under law, Trial Counsel was ineffective for the failure
to properly object and request proper instructions
on the concepts and the prejudice resulting therefrom
was a jury, who probably could not understand the
two concepts without further explanation. See, Bloomer
v. United States, 162 F.3d 187, 192-195 (2nd Cir.
1998)(trial counsel ineffective for failure to properly

-68-

request proper jury instructions on reasonable doubt,
remanded for evidentiary hearing); Reagan v. Norris,
365 F.3d 616, 621-622 (8th Cir. 2004)(failure to request
proper jury instructions under applicable state law
constitutes ineffective assistance of trial counsel);
Kubat v. Thieret, 867 F.2d  351, 370 (7th Cir. 1989)
(same).

Likewise, the failure of appellate counsel to
raise counsel's ineffectiveness on appeal, which would
have prevailed nder existing law, amounted to, under
the circumstances to ineffective assistance of Appellate
Counsel and was more meritorious than the issues raised
on appeal. Sanders v. Cotton, 398 F.3d at 584-585
(ineffective assistance of appellate counsel found
for the failure to raise claim of trial court's refusal
to give proper jury instructions); Roe v. Delo, 168
F.3d 416, 418-420 (8th Cir. 1998)(same); McKee v.
United States, 167 F.3d 103, 106-109 (2nd Cir. 1999)
(same).

Consequently, this issue has more than a likelihood
of success on the merits.

E.    Trial Counsel's Failure To Question The
Complainant During Trial As To How The
Petitioner Knew Of Certain Intimate Facts
About Her And Her Family, Which The
Petitioner Testified To At Trial, Where
The Question And Answer Would Have Shown
That The Petitioner And The Complainant
Knew Each Other And Therefore Would Undermine
The Complainant's Credibility, Amounted
To Under The Circumstances To Ineffective
Assistance Of Counsel And An Abandonment
Of The Petitioner's Sole Defense, Which
Was That The Sexual Encounter With The
Complainant Was Consensual And That The
Petitioner Knew The Complainant Beforehand
And Appellate Counsel's Failure To Raise
Trial Counsel's Ineffectiveness, Which
Would Have Prevailed Under Existing Law,
Amounted To Ineffective Assistance Of
Appellate Counsel

Ineffective assistance of Trial Counsel may be

found by Trial Counsel's failure to cross-examine

a state's principle witness or impeach that witnesses

credibility. Johnson v.Norris, 999 F.Supp. 1256, 1264-

1265 (E.D.Ark. 1998)(defendant denied efffective assistance

of trial counsel, by counsel's failure to properly

cross-examine the government's chief state witness,

where some of the testimony given was inaccurate and

trial counsel failed to impeach witness); Tucker v.

Prelesnik,  181 F.3d 747, 756-757 (6th Cir. 1999)(trial

counsel's failure to impeach witness with available

information constituted ineffective assistance of

-70-

trial counsel; grant of habeas corpus affirmed);
Stouffer v. Reynolds, 214 F.3d 1231, 1233-1235
(10th Cir. 2000)(Trial Counsel found ineffective for
the failure to lay proper grounds for admission evidence
which would have impeached key prosecution witness;
affirming order granting writ of habeas corpus);
Spencer v. Donnelly, 193 F.Supp.2d 718, 721-735
(W.D.N.Y. 2002)(Trial Counsel ineffective for the
failure to impeach complaining witness with inconsistent
statements); Tucker v. Renico, 317 F.Supp.2d 766,
773-777 (E.D.Mich. 2004)(failure to impeach complainant
with evidence of prior association, where witness
denied relationship constituted ineffective assistance
of Trial Counsel).

This issue is governed by the above-cited cases.

Here, there was testimony from the Complainant
that she had never met the Petitioner and that during
their sexual encounter that the Complainant never
discussed aspects of her personal life with the
Petitioner  (Tr. II/93-94, 97-98, 143-147, 172).
However, during the Petitioner's testimony numerous
intimate facts of the Complainant were known by the

-71-

Petitioner, which he could not have obtained anywhere
else, but from the Complainant, who denied telling
the Petitioner any facts about her life or family
during their encounter (Tr. II/172; Tr. IV/12-19,
38-40, 92-97, 99-138). However, after the Petitioner
testified, Trial Counsel, never recalled the Complainant
to ask her how the Petitioner knew about so many intimate
facts of her life, if they had never met before and
if the Petitioner did not know her.

This failure amounted to under the circumstances
to ineffective assistance of Trial Counsel for the
failure to impeach the Complainant with damaging evidence
which would have completely contradicted her testimony
that she had been kidnapped and raped by someone she
had never met and did not know. Due to this, Johnson,
Tucker, Stouffer, Spencer control the disposition
of this issue because like in those cases trial counsel
failed to properly cross-examine and impeach witnesses
credibility, as counsel failed to do here. Ineffective
Assistance of Trial Counsel could be properly found
under the facts and circumstances of this case.

-72-

Likewise, Appellate Counsel's failure to raise
Trial Counsel's ineffectiveness, which would have
prevailed and the Petitioner would have been granted
a new trial, ineffective assistance of Appellate Counsel
should be found.  Banyard v. Duncan, 342 F.Supp.2d
865, 886-887 (C.D.Cal. 2004)(appellate counsel provided
ineffective assistance in failing to raise trial counsel's
ineffectiveness; writ granted).

Consequently, this ground herein has more than
a reasonable likelihood on the merits to prevail.

   F.   The Cumulative Effect Of Trial And
        Appellate Counsel's Errors Deprived
        The Petitioner The Right To A Fair Trial
        And Effective Assistance OF Both Trial
        And Appellate Counsel

This Honorable Court may properly consider the
cumulative effect of both Trial and Appellate Counsel's
errors as set forth more fully in the preceding arguments,
which are hereby made part of this argument here,
in order to consider granting relief, because although
one error might not be sufficiently prejudicial, the
cumulative effect of the errors may be.  Moore v.
Johnson, 185 F.3d at 276-279.

Consequently, this ground herein has more than
a reasonable likelihood of success on the merits.

-73-

II.  THIS HONORABLE COURT SHOULD APPOINT COUNSEL TO
     REPRESENT PETITIONER IN THIS CASE, PURSUANT TO
     18 U.S.C. § 3006A(a)(2)(B) IN THE INTEREST OF
     JUSTICE

     Although, there is no automatic right on the
part of an indigent prisoner under 28 U.S.C. § 2254
to the appointment of counsel under the Sixth Amendment
to the United States Constitution, <u>Mansi v. Maloney</u>,
283 F.Supp. 307, 318-319 (D.Mass. 2003), counsel,
however, may be appointed under either 28 U.S.C. §
2254(h) or 18 U.S.C. § 3006A(g) and which is discretionary
with the court under both provisions.  The standard
is whether "the interests of justice so require,"
and Section 3006A(g) requires a determination that
the petition is not frivolous and that the appointment
will benefit the petitioner and the court.  <u>Reese
v. Fulcomer</u>, 946 F.2d 247, 263 (3rd Cir. 1991); <u>Blaisi
v. Attorney General of the Commonwealth of Pennsylvania</u>,
30 F.Supp.2d 481, 489 (M.D.Pa. 1998).  Factors to
be considered include the complexity of the factual
and legal issues, and the pro se litigant's ability
to investigate the facts and litigate the claims.

-74-

Id.

Also instructive to determine whether counsel
should be appointed is a non-exhaustive list of factors
to be considered by the court in deciding whether
to appoint counsel under 18 U.S.C. § 3006A, as set
forth so aptly by the Third Circuit in Tabron v. Grace,
6 F.3d 147 (3rd Cir. 1993), which are: (1) the Petitioner's
ability to present the case, including education,
literacy, prior work experience, prior litigation
experience and ability to understand english.  Id.,
6 F.3d at 156; (2) the difficulty with the legal issues
involved with the case.  Id.; (3) the ability of the
Petitioner to investigate the case, including limits
related to incarceration, the exetent of discovery,
and the effect of complex discovery rules. Id.; (4)
whether the outcome of the case depends upon witness
credibility.  Id.; (5) the time when counsel becomes
necessary.  Id., 6 F.3d at 156-157.

Here, the Petitioner should be appointed counsel
to represent him, as the Petitioner has no prior litigation
experience, the Petitioner was required to seek the

-75-

assistance of another inmate to assist him in all
research, preparation and filing, which the paralegal
has done thus far, however, that is a temporary situation
since the paralegal only agreed to assist him to file
his habeas petition, assist in initial pleadings and
assist the Petitioner in obtaining counsel in the
Massachusetts Court's to represent him on hsi motion
for a new trial.  After that, there will be no further
assistance from him, due to his other personal matters,
which must be addressed.  That the legal issues involved
are sufficiently complex to warrant the appointment
of counsel in this case, otherwise, the Petitioner
will be left totally without assistance and will be
unable to proceed further.  Moreover, notwithstahding
the fact that the Massachusetts prison system provides
law clerk's to assist inmates in accordance with a
court decree, the inmates currently working in the
prison law library are unable to assist inmates with
research and even assisting them in filing habeas
corpus petitions.

Thus, from all of the above-factors, the Petitioner

-76-

respectfully requests the appointment of counsel to
represent him in this habeas corpus proceeding in
the interests of justice. Mansi v. Maloney, 283 F.Supp.2d
at 318(appointment of counsel granted because legal
and factual issues are complicated).

## CONCLUSION

For all the foregoing reasons as set forth herein,
the Petitioner respectfully requests that the Respondent's
Motion to Dismiss be denied, that the request for
a stay be allowed to the Petitioner in order for him
to return to state court to exhaust certain issues
and respectfully requests to appoint counsel to represent
him.

Respectfully submitted,

Derek Biggs, pro se
North Central Correctional Institution
500 Colony Road - P.O. Box 466
Gardner, MA. 01440

DATED: JULY 19, 2005
         GARDNER, MA.

## CERTIFICATE OF SERVICE

I, Derek Biggs do hereby certify that on this
26th day of July, 2005, I served a true copy of this
document upon the Respondent, by mailing a copy of
the same, postage prepaid to Respondent's attorney
of record, David M. Lieber, Esq., Assistant Attorney
General for the Commonwealth of Massachusetts, Criminal
Bureau, One Ashburton Place, Boston, MA. 02108.

Derek Biggs, pro se

-77-

# Text

Exhibit 1

# OPINIONS OF THE UNITED STATES SUPREME COURT

### JURIES

The California standard for making a prima facie showing that peremptory strikes of jurors were based on purposeful discrimination, which requires an objector to show that it is more likely than not that the other party's peremptory challenges, if unexplained, were based on impermissible group bias, is an inappropriate standard for measuring the sufficiency of a prima facie case under the first step of *Batson v. Kentucky*, 476 U.S. 79 (1986), which requires the production of evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. (*Johnson v. California*, U.S., No. 04-6964, 6/13/05) Page 278

## Full Text of Opinions

### JAY SHAWN JOHNSON, PETITIONER v. CALIFORNIA

#### No. 04-6964

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT

Syllabus

No. 04-6964. Argued April 18, 2005—Decided June 13, 2005

Petitioner Johnson, a black man, was convicted in a California state court of assaulting and murdering a white child. During jury selection, a number of prospective jurors were removed for cause until 43 eligible jurors remained, three of whom were black. The prosecutor used 3 of his 12 peremptory challenges to remove the prospective black jurors, resulting in an all-white jury. Defense counsel objected to those strikes on the ground that they were unconstitutionally based on race. The trial

COPYRIGHT © 2005 BY THE BUREAU OF NATIONAL AFFAIRS, INC., WASHINGTON, D.C.    CRL    ISSN 0011-1341

tablish a "strong likelihood" that the peremptory strikes had been impermissibly based on race. Instead, the trial judge should have only required petitioner to proffer enough evidence to support an "inference" of discrimination.[2] The Court of Appeal's holding relied on decisions of this Court, prior California case law, and the decision of the United States Court of Appeals for the Ninth Circuit in *Wade v. Terhune*, 202 F. 3d 1190 (2000). Applying the proper "reasonable inference" standard, the majority concluded that petitioner had produced sufficient evidence to support a prima facie case.

Respondent appealed, and the California Supreme Court reinstated petitioner's conviction over the dissent of two justices. The court stressed that *Batson v. Kentucky*, 476 U. S. 79 (1986), left to state courts the task of establishing the standards used to evaluate the sufficiency of defendants' prima facie cases. 30 Cal. 4th, at 1314, 71 P. 3d, at 277. The court then reviewed *Batson*, *Wheeler*, and those decisions' progeny, and concluded that "*Wheeler's* terms 'strong likelihood' and 'reasonable inference' state the same standard"—one that is entirely consistent with *Batson*, 30 Cal. 4th, at 1313, 71 P. 3d, at 277. A prima facie case under *Batson* establishes a "'legally mandatory, rebuttable presumption,'" it does not merely constitute "enough evidence to *permit* the inference" that discrimination has occurred. 30 Cal. 4th, at 1315, 71 P. 3d, at 278. *Batson*, the court held, "permits a court to require the objector to present, not merely 'some evidence' permitting the inference, but 'strong evidence' that makes discriminatory intent *more likely than not* if the challenges are not explained." 30 Cal. 4th, at 1316, 71 P. 3d, at 278. The court opined that while this burden is "not onerous," it remains "substantial." *Ibid.*, 71 P. 3d, at 279.

Applying that standard, the court acknowledged that the case involved the "highly relevant" circumstance that a black defendant was "charged with killing 'his White girlfriend's child,'" and that "it certainly looks suspicious that all three African-American prospective jurors were removed from the jury." *Id.*, at 1326, 71 P. 3d, at 286. Yet petitioner's *Batson* showing, the court held, consisted "primarily of the statistical disparity of peremptory challenges between African-Americans and others." 30 Cal. 4th, at 1327, 71 P. 3d, at 287. Although those statistics were indeed "troubling and, as the trial court stated, the question was close," *id.*, at 1328, 71 P. 3d, at 287, the court decided to defer to the trial judge's "carefully considered ruling." *Ibid.*[3] We granted

certiorari, but dismissed the case for want of jurisdiction because the judgment was not yet final. *Johnson v. California*, 541 U. S. 428 (2004) *(per curiam)*. After the California Court of Appeal decided the remaining issues, we again granted certiorari. 543 U. S. ___ (2005).

## II

The issue in this case is narrow but important. It concerns the scope of the first of three steps this Court enumerated in *Batson*, which together guide trial courts' constitutional review of peremptory strikes. Those three *Batson* steps should by now be familiar. First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." 476 U. S., at 93–94 (citing *Washington v. Davis*, 426 U. S. 229, 239–242 (1976)).[4] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. 476 U. S., at 94; see also *Alexander v. Louisiana*, 405 U. S. 625, 632 (1972). Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem*, 514 U. S. 765, 767 (1995) *(per curiam)*.

The question before us is whether *Batson* permits California to require at step one that "the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias." 30 Cal. 4th, at 1318, 71 P. 3d, at 280. Although we recognize that States do have flexibility in formulating appropriate procedures to comply with *Batson*, we conclude that California's "more likely than not" standard is an inappropriate yardstick by which to measure the sufficiency of a prima facie case.

We begin with *Batson* itself, which on its own terms provides no support for California's rule. There, we held that a prima facie case of discrimination can be made out by offering a wide variety of evidence,[5] so long as the sum of the proffered facts gives "rise to an inference of discriminatory purpose." 476 U. S., at 94. We explained that

> "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to

---

[2] In reaching this holding, the Court of Appeal rejected the notion that a showing of a "'strong likelihood'" is equivalent to a "'reasonable inference.'" To conclude so would "be as novel a proposition as the idea that 'clear and convincing evidence' has always meant a 'preponderance of the evidence.'" 105 Cal. Rptr. 2d, at 733.

[3] In dissent, Justice Kennard argued that "[r]equiring a defendant to persuade the trial court of the prosecutor's discriminatory purpose at the first *Wheeler-Batson* stage short-circuits the process, and provides inadequate protection for the defendant's right to a fair trial . . . ." 30 Cal. 4th, at 1333, 71 P. 3d, at 291. The proper standard for measuring a prima facie case under *Batson* is whether the defendant has identified actions by the prosecutor that, "*if unexplained*, permit a reasonable inference of an improper purpose or motive." 30 Cal. 4th, at 1339, 71 P. 3d, at 294. Trial judges, Justice Kennard argued, should not speculate when it is not "apparent

that the [neutral] explanation was the true reason for the challenge." *Id.*, at 1340, 71 P. 3d, at 295.

[4] An "inference" is generally understood to be a "conclusion reached by considering other facts and deducing a logical consequence from them." Black's Law Dictionary 781 (7th ed. 1999).

[5] In *Batson*, we spoke of the methods by which prima facie cases could be proved in permissive terms. A defendant may satisfy his prima facie burden, we said, "by relying solely on the facts concerning [the selection of the venire] *in his case*." 476 U. S., at 95 (emphasis in original). We declined to require proof of a pattern or practice because " '[a] single invidiously discriminatory governmental act' is not 'immunized by the absence of such discrimination in the making of other comparable decisions.' " *Ibid.* (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U. S. 252, 266, n. 14 (1977)).

to vindicate and encourages "prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process." *Hernandez* v. *New York*, 500 U. S. 352, 358–359 (1991) (opinion of KENNEDY, J.).

The disagreements among the state-court judges who reviewed the record in this case illustrate the imprecision of relying on judicial speculation to resolve plausible claims of discrimination. In this case the inference of discrimination was sufficient to invoke a comment by the trial judge "that 'we are very close,' " and on review, the California Supreme acknowledged that "it certainly looks suspicious that all three African-American prospective jurors were removed from the jury." 30 Cal. 4th, at 1307, 1326, 71 P. 3d, at 273, 286. Those inferences that discrimination may have occurred were sufficient to establish a prima facie case under *Batson*.

The facts of this case well illustrate that California's "more likely than not" standard is at odds with the prima facie inquiry mandated by *Batson*. The judgment of the California Supreme Court is therefore reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered*

JUSTICE BREYER, concurring.

I join the Court's opinion while maintaining here the views I set forth in my concurring opinion in *Miller-El* v. *Dretke*, *post*, p. ___.

JUSTICE THOMAS, dissenting.

The Court says that States "have flexibility in formulating appropriate procedures to comply with *Batson* [v. *Kentucky*, 476 U. S. 79 (1986)]," *ante*, at 6, but it then tells California how to comply with "the prima facie inquiry mandated by *Batson*," *ante*, at 11. In *Batson* itself, this Court disclaimed any intent to instruct state courts on how to implement its holding. 476 U. S., at 99 ("We decline, however, to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges"); *id.*, at 99–100, n. 24. According to *Batson*, the Equal Protection Clause requires that prosecutors select juries based on factors other than race—not that litigants bear particular burdens of proof or persuasion. Because *Batson's* burden-shifting approach is "a prophylactic framework" that polices racially discriminatory jury selection rather than "an independent constitutional command," *Pennsylvania* v. *Finley*, 481 U. S. 551, 555 (1987), States have "wide discretion, subject to the minimum requirements of the Fourteenth Amendment, to experiment with solutions to difficult problems of policy," *Smith* v. *Robbins*, 528 U. S. 259, 273 (2000); *Dickerson* v. *United States*, 530 U. S. 428, 438–439 (2000). California's procedure falls comfortably within its broad discretion to craft its own rules of criminal procedure, and I therefore respectfully dissent.

STEPHEN B. BEDRICK, Oakland, Calif. (Eric Schnapper on the briefs) for petitioner; SETH K. SCHALIT, California Supervising Deputy Attorney General (Bill Lockyer, Atty. Gen., Robert R. Anderson, Chief Asst. Atty. Gen., Gerald A. Engler, Sr. Asst. Atty. Gen., and Laurence K. Sullivan, Supervising Dpty. Atty. Gen., on the briefs) for respondent.